1  ERIC GRANT
   United States Attorney
2  NCHEKUBE ONYIMA
   Special Assistant United States Attorney
3  SHEA J. KENNY
   Assistant United States Attorney
4  501 I Street, Suite 10-100
   Sacramento, CA 95814
5  Telephone: (916) 554-2700

6

7  Attorneys for Plaintiff
   United States of America

8

**FILED**

Nov 20, 2025

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO. 2:25-cr-0268 JAM |
|---|---|
| Plaintiff, | 18 U.S.C. § 1344(2) – Bank Fraud (9 counts); 18 U.S.C. § 1028A – Aggravated Identity Theft; 18 U.S.C. § 982(a)(2)(A) – Criminal Forfeiture |
| v. | |
| ANTHONY SILVA, | |
| Defendant. | |

I N D I C T M E N T

COUNTS ONE THROUGH NINE: [18 U.S.C. § 1344(2) – Bank Fraud]

The Grand Jury charges:

ANTHONY SILVA,

defendant herein, as follows:

## I.    **INTRODUCTION**

At all relevant times,

*Federal and State Unemployment Insurance*

1.    Unemployment insurance (UI) was a state-federal program that provided monetary benefits to eligible lawful workers. Although state workforce agencies administered their respective UI programs, they were required to do so in accordance with federal laws and regulations. UI payments ("benefits") were intended to provide temporary financial assistance to lawful workers who were

1  unemployed through no fault of their own.  Each state set its own additional requirements for eligibility,

2  benefit amounts, and length of time benefits could be paid.  Generally, UI weekly benefit amounts were

3  based on a percentage of earnings over a base period.  In the State of California, the Employment

4  Development Department (EDD) administered the UI program, which was based in Sacramento,

5  California.

6       2.      On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security (CARES) Act

7  was signed into law.  It expanded states' ability to provide assistance to many workers impacted by

8  COVID-19, including for workers who were not ordinarily eligible for UI benefits.  The CARES Act

9  provided three new temporary UI programs: Pandemic Unemployment Assistance (PUA); Pandemic

10  Emergency Unemployment Compensation (PEUC); and Federal Pandemic Unemployment

11  Compensation (FPUC).

12       3.      The first program, PUA, initially provided for up to 39 weeks of benefits to individuals

13  who were: (1) self-employed, seeking part-time employment, or otherwise would not qualify for regular

14  UI or extended benefits under state or federal law or PEUC under section 2107 of the CARES Act; and

15  (2) unemployed, partially unemployed, unable to work, or unavailable to work due to COVID-19 related

16  reason(s).  Coverage included individuals who had exhausted all rights to regular UC or extended

17  benefits under state or federal law or PEUC.  Business owners, self-employed workers, independent

18  contractors, or gig workers could qualify for PUA benefits administered by the California EDD if they

19  previously performed such work in California and were unemployed, partially unemployed, unable to

20  work, or unavailable to work due to COVID-19.  PUA claimants were required to answer specific

21  questions to establish their eligibility for PUA benefits, including providing their name, Social Security

22  Number (SSN), and mailing address and self-certifying that they met one of the COVID-19 related

23  reasons for being unemployed, partially unemployed, or unable or unavailable to work.  Initially, to be

24  eligible to receive PUA benefits, a claimant must have weeks of unemployment beginning on or after

25  January 27, 2020, through December 31, 2020.

26       4.      The second program, PEUC, initially provided for up to 13 times the individual's average

27  weekly benefit amount to individuals who had exhausted regular UI under state or federal law, had no

28  rights to regular UI under any other state or federal law, were not receiving UI under the UI laws of

INDICTMENT

2

1  Canada, and were able to work, available for work, and actively seeking work.  The eligible timeframe

2  to receive PEUC was from the weeks of unemployment beginning after the respective state had an

3  established agreement with the federal government through December 31, 2020.  The earliest eligible

4  date was April 5, 2020.

5        5.     The third program, FPUC, provided individuals who were collecting regular UI, PEUC,

6  PUA, and several other forms of UC with an additional $600 per week.  The eligible timeframe to

7  receive FPUC was from the week of unemployment beginning after the respective state had an

8  established agreement with the federal government through July 31, 2020.  The earliest eligible date was

9  April 5, 2020.

10        6.     The Lost Wages Assistance Program was a federal-state unemployment benefit that

11  provided an additional $300.00 payment to weekly UI benefits for up to six weeks beginning July 26,

12  2020, to September 5, 2020, for eligible claimants.

13        7.     Pandemic Additional Compensation authorized under the federal CARES Act provided

14  an additional $300.00 to weekly UI benefits for up to eleven weeks from December 27, 2020, to March

15  13, 2021.

16        8.     The Continued Assistance Act (CAA) added an additional eleven weeks of PEUC and

17  PUA benefit payments from December 27, 2020, to March 13, 2021.  The CAA also extended the FPUC

18  payment adding an additional $300.00 per week, to the weekly benefits from December 7, 2020, to

19  March 13, 2021.

20        9.     The American Rescue Plan Act added an additional twenty-five weeks of PEUC and

21  PUA benefit payments from March 14, 2021, through September 4, 2021.  The American Rescue Plan

22  Act also extended the FPUC payment adding an additional $300.00 per week to the weekly benefits

23  from March 14, 2021, to September 4, 2021.

24       10.     Regardless of which of the three programs described above was involved (that is, PUA,

25  PEUC, FPUC, LWA), UI benefits were distributed to program participants by the California EDD.

26  These funds were received by the EDD from the United States Department of the Treasury.

27  *California's Unemployment Insurance Program*

28       11.     In California, UI claims were commonly filed online through the EDD website, and this

INDICTMENT

1  was typically accomplished using an electronic device that could access the Internet. When an

2  individual filed an online UI claim, EDD automatically maintained certain information regarding the

3  filing of the claim. This information included the date and time the claim was submitted, the name of

4  the person for whom the claim was filed, and the IP address of the device, or ISP account, that was used

5  to file the claim.

6    12.  UI claimants were required to answer various questions to establish their eligibility for UI

7  benefits, including providing, for example, their name, SSN, and mailing address. The claimants were

8  also required to identify a qualifying occupational status and/or COVID-19 related reason for being out

9  of work.

10    13.  After EDD accepted a UI claim, EDD typically deposited UI funds to an Electronic

11  Benefit Payment (EBP) debit card administered by Bank 1 which claimants could use to withdraw cash

12  and pay for their expenses. The debit card was sent via the U.S. Postal Service to the claimant at the

13  address the claimant provided in the UI claim. Claimants could activate their debit card over the phone

14  or online.

15    14.  When receiving regular UI benefits, claimants were typically required to complete a

16  Continued Claim Form (DE 4581) and certify every two weeks, under penalty of perjury, that they

17  remained unemployed and eligible to receive UI benefits. EDD authorized and deposited payment to the

18  debit card after it received the Continued Claim Form.

19    15.  After October 1, 2020, California EDD required UI claimants to verify their identities

20  before a UI claim could be filed online. Once a claimant's identity was verified, they were permitted to

21  re-access their EDD account and complete the UI benefit application process.

22                    *Lending Institution*

23    16.  Bank 1 was a financial institution as defined in 18 U.S.C. § 20, in that it was a member of

24  the Federal Deposit Insurance Corporation ("FDIC"), their deposits were insured by the FDIC, and they

25  were conducting banking business in interstate commerce.

26    **II.    <u>SCHEME AND ARTIFICE TO DEFRAUD</u>**

27    20.  Between on or about July 30, 2020, and continuing through on or about June 17, 2021, in

28  the State and Eastern District of California, and elsewhere, SILVA knowingly and with the intent to

1 | defraud devised, participated in, and executed a scheme and artifice to obtain money, funds, credits,

2 | assets, and other property owned by, and under the custody and control of Bank 1, by means of

3 | materially false and fraudulent pretenses, representations, and promises.

### III. PURPOSE OF THE SCHEME

5 | 21. The purpose of the scheme and artifice was for SILVA to enrich himself unlawfully by

6 | obtaining UI funds that were under the custody and control of Bank 1 through the submission of false

7 | and fraudulent California EDD UI applications.

### IV. MANNER AND MEANS

9 | In furtherance of the scheme and artifice to defraud, SILVA used the following manner and

10 | means among others:

11 | 22. SILVA and others working with him owned and controlled a domain name titled

12 | 'infodelivery.net'.

13 | 23. SILVA and others working with him submitted false and fraudulent EDD UI benefit

14 | applications to California EDD's website using email addresses that utilized the domain name

15 | 'infodelivery.net'. Specifically, SILVA and others working with him filed fraudulent EDD UI

16 | applications using the personal identifying information of other individuals, without those individuals'

17 | knowledge or consent. SILVA and those working with him posed as the purported applicants in order to

18 | apply for and obtain UI benefits to which SILVA and those working with him were not entitled.

19 | 24. SILVA and those working with him included material information in the false and

20 | fraudulent applications, including the purported claimants' name, DOB, Social Security Number

21 | ("SSN"), residence address, mailing address, employment status and employment history. SILVA and

22 | those working with him submitted the false and fraudulent claim applications online via California

23 | EDD's website and other websites on the internet.

24 | 25. The underlying UI benefit applications contained additional false and fraudulent

25 | representations, including, without limitation, that the claimants had worked or resided in California,

26 | had specific annual incomes, had worked during particular time periods, had been self-employed in a

27 | particular field, had been laid off and had no work, and were newly unemployed due to a disaster

28 | including the COVID-19 pandemic. SILVA and those working with him were aware that these claims

1    were false, in that the claimants were not so previously working, residing, employed, newly

2    unemployed, or seeking new employment as represented in the applications.  SILVA and those working

3    with him also knew that these representations regarding the claimants' employment and availability to

4    work were false at the time they were made.  SILVA and those working with him also did not have

5    authority to file these claims on the claimants' behalf.

6        26.    SILVA also personally filed at least one false and fraudulent UI benefit application in his

7    own name.  SILVA reported falsely that he worked 60 hours a week in Redding, California for a certain

8    period of time, that he earned $80,000 in wages, that his employment was terminated because his he was

9    laid off due to the COVID-19 pandemic, and that his place of employment closed as a direct result of the

10    COVID-19 pandemic, when in in truth and in fact this employment information was fabricated.  In an

11    attempt to have his claims approved, SILVA submitted his true SSN and birthdate, but someone else's

12    driver's license.

13        27.    The false and fraudulent representations contained in the underlying UI applications,

14    including those claims for SILVA and Victims 1 through 8, were material and essential to California

15    EDD's decision to approve those claims and pay out UI benefits.  These funds included UI benefits

16    administered under the CARES Act.

17        28.    For many of the fraudulent applications, SILVA and those working with him caused

18    EDD to accept the UI claims and pay out benefits.

19        29. ·    Upon approval of the applications, EDD notified Bank 1, which issued EDD debit cards

20    and mailed them to the address provided on the claim.  SILVA possessed EDD debit cards in the names

21    of Victims 1 through 6, and 8, among others at his residence located at 731 Mast Road, Apt 1L,

22    Manchester Hew Hampshire.

23        30.    SILVA also used debit cards—issued in the names of Victims 1 through 8, among

24    others— to withdraw cash, purchase money orders, and deposit the funds into SILVA's own bank

25    account with BBVA USA.  For example, between on or about October 2020 and on or about June 2021,

26    SILVA purchased at least $8,000 in money orders using EDD debit cards belonging to victims, and

27    deposited the money orders into his BBVA USA account ending in 7564.  Further, between on or about

28    October 3, 2020, through June 1, 2020, SILVA, using the victims' EDD debit cards, withdrew at least

1  $5,500 from various Bank 1 ATMs.

2      31.    During this scheme, EDD periodically caused additional UI funds to be wired into the

3  Bank 1 accounts associated with the cards.

4      32.    In carrying out the scheme, SILVA at all times material acted with the intent to defraud,

5  including the intent to deceive and cheat.

6      33.    SILVA's scheme and artifice to defraud caused EDD to pay out approximately $711,900

7  in benefits for the claims filed in the names of Victims 1 through 8, among others.

8      34.    The claim SILVA filed for himself in Count 9 was denied by EDD. Had EDD paid that

9  claim, EDD would have paid out an additional approximately $17,550 in addition to the $711,900 that

10 was paid.

11 **V.    EXECUTION OF THE SCHEME TO DEFRAUD**

12     On or about the dates set forth below, in the State and Eastern District of California, and

13 elsewhere, SILVA knowingly and with the intent to defraud devised, participated in, and executed a

14 scheme and artifice to obtain money, funds, credits, assets, and other property owned by, and under the

15 custody and control of Bank 1, by means of materially false and fraudulent pretenses, representations,

16 and promises, and did knowingly aid, abet, assist, counsel, induce, and procure the same.

17 ///
18 ///
19 ///
20 ///
21 ///
22 ///
23 ///
24 ///
25 ///
26 ///
27 ///
28 ///

INDICTMENT

7

| Count | On or About Date Range | Execution |
|---|---|---|
| 1 | August 10, 2020, through April 27, 2021 | Submission of a paid UI benefit application by a participant in the scheme in the name of Victim 1 which paid $57,900 in UI benefits, including ATM withdraws using Victim 1's EDD debit card ending in 1715 by SILVA. |
| 2 | August 11, 2020, through April 27, 2021 | Submission of a paid UI benefit application by a participant in the scheme in the name of Victim 2 which paid $57,900 in UI benefits, including ATM withdraws using Victim 2's EDD debit card ending in 4946 by SILVA. |
| 3 | August 11, 2025, through April 27, 2021 | Submission of a paid UI benefit application by a participant in the scheme in the name of Victim 3 which paid $57,900 in UI benefits, including ATM withdraws using Victim 3's EDD debit card ending in 5735 by SILVA. |
| 4 | August 11, 2020, through April 27, 2021 | Submission of a paid UI benefit application by a participant in the scheme in the name of Victim 4 which paid $57,900 in UI benefits, including ATM withdraws using Victim 4's EDD debit card ending in 8108 by SILVA. |
| 5 | August 15, 2020, through April 27, 2021 | Submission of a paid UI benefit application by a participant in the scheme in the name of Victim 5 which paid $58,350 in UI benefits, including ATM withdraws using Victim 5's EDD debit card ending in 1696 by SILVA. |
| 6 | August 18, 2020, through April 27, 2021 | Submission of a paid UI benefit application by a participant in the scheme in the name of Victim 6 which paid $49,350 in UI benefits, including ATM withdraws using Victim 6's EDD debit card ending in 2315 by SILVA. |
| 7 | August 21, 2020, through October 12, 2020 | Submission of a paid UI benefit application by a participant in the scheme in the name of Victim 7 which paid $23,700 in UI benefits, including purchase of money orders using Victim 7's EDD debit card ending in 6026 by SILVA. |
| 8 | August 26, 2020, through April 27, 2021 | Submission of a paid UI benefit application by a participant in the scheme in the name of Victim 8 which paid $58,350 in UI benefits, including ATM withdraws using Victim 8's EDD debit card ending in 8350 by SILVA. |
| 9 | October 4, 2020 through October 5, 2020 | Submission of an Unpaid UI benefit application by SILVA seeking $17,550 in UI benefits. |

All in violation of Title 18, United States Code, Sections 2 and 1344(2).

///

///

///

///

INDICTMENT

COUNT TEN: [18 U.S.C. § 1028A(a)(1) – Aggravated Identity Theft]

The Grand Jury further charges:

ANTHONY SILVA,

defendant herein, on or about April 27, 2021, in the State and Eastern District of California, and elsewhere, did knowingly transfer, possess, and use, without lawful authority, a means of identification of Victim 1, to wit, Victim 1's name, during and in relation to felony violations of Title 18, United States Code, Section 1344(2)—bank fraud—knowing that the means of identification belonged to another actual person, all in violation of Title 18, United States Code, Section 1028A.

FORFEITURE ALLEGATION: [18 U.S.C. §982(a)(2)(A) – Criminal Forfeiture]

1. Upon conviction of one or more of the offenses alleged in Counts One through Nine of this Indictment, defendant ANTHONY SILVA shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(2)(A), any property constituting or derived from proceeds obtained directly or indirectly, as a result of said violations, including but not limited to the following:

a. A sum of money equal to the amount of proceeds obtained directly or indirectly, as a result of such offenses, for which defendant is convicted.

2. If any property subject to forfeiture, as a result of the offenses alleged in Counts One through Nine of this Indictment, for which defendant is convicted:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty;

///
///
///
///
///

INDICTMENT

9

1    it is the intent of the United States, pursuant to 18 U.S.C. § 982(b)(1), incorporating 21 U.S.C. § 853(p),

2    to seek forfeiture of any other property of defendant, up to the value of the property subject to forfeiture.

3

4                                                                    A TRUE BILL.

                                                                     /s/ Signature on file w/AUSA

5    _____         _____
6    ERIC GRANT                                                    FOREPERSON
7    ERIC GRANT
8    United States Attorney

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INDICTMENT                                          10

*No.* 2:25-cr-0268 JAM

# UNITED STATES DISTRICT COURT

*Eastern District of California*

*Criminal Division*

## THE UNITED STATES OF AMERICA

*vs.*

ANTHONY SILVA

## I N D I C T M E N T

**VIOLATION(S):**  18 U.S.C. § 1344(2) – Bank Fraud (9 counts); 18 U.S.C. § 1028A – Aggravated Identity Theft; 18 U.S.C. § 982(a)(2)(A) – Criminal Forfeiture

*A true bill,*          **/s/ Signature on file w/AUSA**

_____
                    *Foreman.*

*Filed in open court this* _____ 20th *day*

*of* __November__ _____, *A.D. 20* 25 ___

_____ /s/ C. Nair _____
                        *Clerk.*

*Bail, $* _ No bail bench warrant to issue.

_____
                        JEREMY D. PETERSON
                        UNITED STATES MAGISTRATE JUDGE

GPO 863 525

2:25-cr-0268 JAM

### United States v. Anthony Silva
### Penalties for Indictment

#### COUNTS 1-9:

VIOLATION:     18 U.S.C. § 1344(2) – Bank Fraud

PENALTIES:     Maximum 30 years imprisonment; or
Fine of up to $1,000,000; or both fine and imprisonment
Supervised release of up to 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

#### COUNT 10:

VIOLATION:     18 U.S.C. § 1028A – Aggravated Identity Theft

PENALTIES:     Mandatory 2 years in prison to run consecutive to any other term imposed
Fine of up to $250,000, or both fine and imprisonment
Supervised release of 1 year

SPECIAL ASSESSMENT: $100 (mandatory on each count)

#### FORFEITURE ALLEGATION:

VIOLATION:     18 U.S.C. §982(a)(2)(A) – Criminal Forfeiture

PENALTIES:     As stated in the charging document